UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                            :
SEA SHIPPING INC., MASON FINANCE               :
CORPORATION, and OCEAN SHIPPING, INC.,         :
                                                            :
            Petitioners-Counterclaim Respondents,    :            11 Civ. 8152 (PAE)
                                                            :
                        -v-                                 :            OPINION & ORDER
                                                            :
HALF MOON SHIPPING, LLC,                        :
                                                            :
            Respondents-Counterclaim Petitioners.    :
                                                            :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        Petitioners Sea Shipping, Inc. ("Sea Shipping"), Mason Finance Corporation ("Mason"),

and Ocean Shipping, Inc. ("Ocean Shipping") (together, "Petitioners") filed this petition to

confirm an arbitration award pursuant to § 9 of the Federal Arbitration Act, 9 U.S.C. § 9 ("FAA"

or the "Act").  Respondent Half Moon Shipping, LLC ("Half Moon") has opposed that petition

and cross-moved to vacate the arbitration award pursuant to Article V of the Convention on the

Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, 330 U.N.T.S. 38

(Dec. 29, 1970) ("New York Convention" or the "Convention"), and § 10(a)(3) and § 10(a)(4) of

the FAA.  For the following reasons, the petition to confirm the arbitration award is granted, and

Half Moon's petition to vacate the award is denied.

# BACKGROUND[1]

Sea Shipping and Ocean Shipping are companies incorporated in the Marshall Islands.

Mason is a Liberian corporation.  Half Moon is a limited liability company that exists under the

laws of Delaware and with a principal place of business in Connecticut.

In April 2003, the parties agreed to purchase, own, and operate two second-hand ocean

going tanker vessels, the M/T Hawaiian Star ("Star Tanker") and the M/T Hawaiian Leader

("Leader Tanker").  To facilitate this project, the parties formed two corporations under the laws

of the Marshall Islands.  On April 23, 2003, Sea Shipping and Mason entered into a

shareholders' agreement with Half Moon with respect to their holdings in Star Transport, Inc.

("Star Corp."), one of the corporations formed for the project.  On the same date, Ocean

Shipping and Mason entered into a separate shareholders' agreement with Half Moon with

respect to their holdings in Leader Transport, Inc. ("Leader Corp."), the second corporation

formed for the project.

The two shareholders' agreements are, for all relevant purposes, identical.  As relevant

here, each company issued 500 common shares with an ownership structure as follows:

ownership of Star Corp. was divided among Sea Shipping (24%), Mason (52%), and Half Moon

(24%); ownership of Leader Corp. was divided among Ocean Shipping (24%), Mason (52%),

and Half Moon (24%).  *See* Aff. of Bruce Paulsen in Supp. of Cross-Mot. to Vacate, Ex. A at 1

(Dkt. 9) ("Star Agreement"); Paulsen Aff. Ex. B at 1 ("Leader Agreement").  The agreements

provided that each company was to "engage in the trade of and owning and operating the [v]essel

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' pleadings and their submissions in support of and in opposition to the instant motion, including the August 26, 2011 decision and final award of the arbitral panel.  Except where specifically referenced, no further citation to these sources will be made.

and chartering or otherwise letting or hiring the [v]essel for reward." *Id.* § 1(a).  Both

agreements provide that the conduct of business – including, *inter alia*, any sale of material

assets or any expenditure exceeding $300,000 – requires approval by the holders of 76% of the

shares of the company.  *Id.* § 2.

  Section 4 of each agreement provides that any additional funds required by the company

"from time to time shall be procured by borrowing from the [s]hareholders on a pro rata basis."

*Id.* § 4(c).  Further, in the event that the company required additional funding and a shareholder

failed to loan its pro rata share of the needed funds, such a shareholder would be considered in

default.  *See id.* § 4(d).  In the event of such a default, both agreements authorize any non-

defaulting shareholder to advance the shortfall (or its pro rata share of the shortfall), with such an

advance "considered an open account demand loan to the defaulting [s]hareholder bearing

interest at a monthly default rate of 2% for each month" until the loan is paid.  *Id.* § 4(e)–(f).

Any assumption of debt by either Star Corp. or Leader Corp. pursuant to section 4 – *i.e.*, by

means of shareholder loans – does not require that the holders of 76% of the company's shares

approve the transaction, as is required for all other debts assumed by either company.  *Id.* §

2(b)(xi).

  In addition, the shareholders' agreements provide that any controversy arising out of

them will be resolved by arbitration in New York City, N.Y., in accordance with the rules of the

Society of Maritime Arbitrators ("SMA").  *Id.* § 16.  The SMA's rules, in turn, provide for the

consolidation of contract disputes which (1) involve common questions of fact or law, or (2)

arise from the same transaction.

  In July 2006, more than three years after the execution of the two shareholders'

agreements, the parties sold the Leader Tanker.  In September 2006, the parties purchased

another tanker, the M/T Sea Sapphire ("Sapphire Tanker"), in part funded by accumulated profits from the operation of Star Tanker and Leader Tanker. The parties formed a third Marshall Island corporation, Sapphire Transport, Inc. ("Sapphire Corp.") which was owned in equal parts by Star Corp. and Leader Corp., and which took full ownership of the Sapphire Tanker. In February 2007, the parties sold the Star Tanker.

In May 2007, Sea Shipping, Mason, and Half Moon sold their shares in Star Corp. to Leader Corp. As a result of that sale, Leader Corp. gained full ownership of Sapphire Corp..

Also in May 2007, Sea Shipping, Ocean Shipping, and Mason approved a request by Half Moon to redeem its shares in Star Corp. and to take a cash payout equal to its proportionate share of the company's accumulated profits. This transaction benefited Half Moon, in that the company experienced no adverse tax consequences from redeeming its Star Corp. stock, and it maintained its 24% ownership interest in Leader Corp., and accordingly, in Sapphire Corp. A stock redemption agreement between Star Corp. and Half Moon was executed by the parties in May 2007, and Half Moon received its proportionate share of Star Corp.'s accumulated profits, which amounted to approximately $4.38 million. The parties agree that in June 2007, following Half Moon's stock redemption, the ownership structure of Leader Corp. remained the same as at the company's formation: Ocean Shipping held 24%, Mason held 52%, and Half Moon held 24%. *See* Arbitration Award, Paulsen Aff. Ex. H at 3 ("Award").

Following the sale of Star Corp. to Leader and the redemption of Half Moon's shares in Star Corp., Sapphire Tanker required an estimated $4 million in additional funds to support its continued operation. Pursuant to the Leader shareholders' agreement, which directed that such funds be loaned to the company by its shareholders, Petitioners advanced a loan of $3 million – approximately its pro rata share of the needed funds – to Sapphire Corp. Later, in May 2009

4

when Sapphire Corp. required additional funding, Petitioners requested that Half Moon contribute its pro rata share of the previous loan, or $960,000.  However, claiming it was not legally bound to fund Sapphire Corp., Half Moon declined to make the requested loan.

On September 17, 2009, the Petitioners demanded arbitration with respect to claims arising out of the Leader shareholders' agreement, and Half Moon's refusal to make the requested loan to Sapphire Corp.  On the same date, Petitioners appointed an arbitrator.  On October 3, 2009, Half Moon appointed its arbitrator, and on October 29, 2009, the two arbitrators appointed the third arbitrator.

In early 2010, a second claim arose, in which Half Moon was alleged to have defaulted on its obligations.  Due to diminishing market prospects, Leader's majority shareholder decided to sell the Sapphire Tanker.  Mason approached the other shareholders, including Half Moon, seeking approval to sell the ship at a substantial loss.  Half Moon asserted that it had abandoned its shares in Leader Corp., and in turn, was not liable for losses arising out of the operation of Sapphire Corp.  The Sapphire Tanker was sold at a loss, with $7.93 million outstanding on its mortgage.  The mortgage had been guaranteed by both Star Corp. and Leader Corp.  To satisfy the mortgagee, Petitioners loaned Sapphire Corp. an additional $13.15 million.  Petitioners alleged that the shareholders' agreement required Half Moon to contribute $2,196,000 – its pro rata share of the amount needed to satisfy the mortgage.  Half Moon maintained that it was not liable for any part of the balance due on the mortgage guaranteed by Leader Corp.

Arbitration hearings were held on February 9, 2010 and October 11, 2010, after which the parties each submitted post-hearing briefs.  The arbitration addressed both Petitioners' claim relating to the $960,000 that they claimed Half Moon had been obligated to contribute in May 2009, and the $2,196,000 that they claimed Half Moon has been obligated to contribute in 2010.

Petitioners alleged that, pursuant to section 4 of the Leader shareholders' agreement, the shareholders, including Half Moon, had committed to lend money on a pro rata basis to Leader Corp. when it required additional funding.  Petitioners further alleged that pursuant to this commitment, Half Moon had been obligated to contribute its 24% share (1) in 2009, when the company required $4 million to cover anticipated operating costs, and (2) in 2010, when the company sold the Sapphire Tanker at a loss and required an infusion of $13.15 million to satisfy the outstanding mortgage on the tanker.  Petitioners asserted that Half Moon had failed to make either of the contributions and was therefore in default.

Half Moon disputed that claim.  It argued that clause 4 of the Leader shareholder agreement did not require all shareholders to lend money to the company whenever it required additional funds.  Rather, Half Moon claimed that if Leader Corp. sought a loan from its shareholders, each shareholder was entitled to consider the risks of such a loan and decide for itself whether to make the loan.  Thus, Half Moon argued, the requirements of clause 4 were triggered only if a shareholder committed to making such a loan, and later defaulted on that commitment.  Half Moon separately argued that the Stock Sale and Purchase Agreement that it had executed in the course of redeeming its shares in Star Corp. terminated any obligations that it had had with respect to Leader Corp., and in turn, Sapphire Corp.

In a decision issued August 26, 2011, the arbitral panel unanimously held for Petitioners. The arbitral panel based its decision on three independent grounds.  First, the panel held the plain language of the shareholders' agreement required that necessary funds be supplied by the shareholders on a pro rata basis, and that any shareholder that failed to contribute its share was in default.  The panel rejected Half Moon's claim that the Stock Sale and Purchase Agreement between Star Corp. and Half Moon had relieved Half Moon of its obligation to fund Leader

Corp., and thus Sapphire Corp., and to share in any losses. Rather, the panel found that Half Moon had a continuing obligation to proportionately fund Leader Corp., and that this obligation had been a condition of approval of its stock redemption by the Star Corp. majority shareholders. Second, the panel held that the parties' interactions had amounted to an implied joint venture and, as such, imposed liability proportionate to share ownership on all parties for losses arising out of such activities. Third, the panel held that Petitioners had a cognizable claim against Half Moon for its proportionate share of the advanced funds based on a theory of promissory estoppel. *See* Award at 7–9.

The panel awarded damages to Petitioners in the amount of $4,504,888, which included the $3,156,000 principal, attorney's fees, costs, and interest of 2% per month, as provided in the shareholders' agreement. The award provided that if Half Moon did not make this payment within 30 days of the date of the award, interest would accrue at the rate of 3.75% per annum on the principal sum of $3,156,000 until the full amount was paid or the award was reduced to a court judgment.

The award also required Half Moon to pay $9,200 in fees to the arbitrators (above the amount already held in escrow), but provided that all parties were jointly and severally liable for the full amount of the fees. The award provided that if any party defaulted on the arbitrators' fees, and the non-defaulting party advanced its adversary's share, the non-defaulting party is entitled to reimbursement of the amount paid on behalf of the adversary, plus interest accruing at the rate of 3.25%.

Half Moon did not pay its share of the arbitrators' fees within 30 days of the date of the award. On October 11, 2011, Petitioners, in turn, paid $9,200 on behalf of Half Moon to the arbitrators.

**DISCUSSION**

In their petition, Sea Shipping, Ocean Shipping, and Mason seek confirmation of the arbitral award.  In the cross-petition, Half Moon seeks to vacate the award, claiming that it manifestly disregards controlling law.

Chapter 2 of the FAA, 9 U.S.C. §§ 201–08, which codifies the New York Convention, governs arbitration agreements that arise from a "legal relationship, whether contractual or commercial, which is considered commercial," except when those relationships are "entirely between citizens of the United States" and are otherwise domestic in nature.  9 U.S.C. § 202. Applying § 202, the Second Circuit has held that where an agreement to arbitrate "involve[s] parties domiciled or having their principal place of business outside [the United States]," that agreement is governed by the Convention.  *See Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 19 (2d Cir. 1997) (internal citation omitted).  Because Petitioners are all incorporated outside the United States, and the present dispute arises out of agreements to which they are parties, the New York Convention governs the petition before the Court.

However, where, as here, arbitration was conducted in the United States, chapter 2 and the Convention "allow a court in the country under whose law the arbitration was conducted to apply domestic arbitral law, in this case the FAA, to a motion to set aside or vacate the arbitral award."  *Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 21; *see also Halcot Navigation L.P. v. Stolt-Nielson Transp. Grp., BV*, 491 F. Supp. 2d 413, 420 (S.D.N.Y. 2007) (when arbitration is governed by the New York Convention, "this Court can also look to domestic arbitration law, specifically the FAA").

The FAA, in turn, provides a "streamlined" process for a party seeking a "judicial decree confirming an award, an order vacating it, or an order modifying or correcting it."  *Hall St.*

*Assocs. L.L.C. v. Mattell, Inc.*, 552 U.S. 576, 582 (2008).  "Normally, confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court, and the court must grant the award unless the award is vacated, modified, or corrected."  *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006). Review of an arbitral award by a district court "is 'severely limited' so as not unduly to frustrate the goals of arbitration, namely to settle disputes efficiently and avoid long and expensive litigation."  *Salzman v. KCD Fin., Inc.*, No. 11-cv-5865, 2011 WL 6778499, at *2 (S.D.N.Y. Dec. 21, 2011) (quoting *Willemijn Houdstermaatschappij, BV v. Standards Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir. 1997)).  "A party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid summary confirmation of an arbitration award is high."  *D.H. Blair & Co.*, 462 F.3d at 110.  The party moving the court to vacate an arbitral award "must clear a high hurdle," *Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1767 (2010), and bears a "heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law," *Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004).

The FAA sets out limited instances in which a district court may vacate an arbitral award. These include, *inter alia*, "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced," and "where the arbitrators exceeded their powers."  9 U.S.C. § 10(a)(3), (4).  The Second Circuit has held that under § 10 of the FAA, "an arbitrator's award may also be vacated 'where the arbitrator's award is in manifest disregard of the terms of

the [parties' relevant] agreement.'" *Schwartz v. Merrill Lynch & Co.*, No. 10-0826, 2011 WL 5966616, at *7 (2d Cir. Nov. 30, 2011) (quoting *Yusuf Ahmed*, 126 F.3d at 23).[2]

Here, Half Moon argues that the arbitral panel acted in manifest disregard of the law as to each of the three alternative grounds on which it based its ruling. *See* Resp't's Br. 9–18. Half Moon does not allege that it is entitled to vacatur under any of the statutory grounds under the FAA.

Arbitral awards should be vacated under the manifest disregard standard "only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent." *T. Co. Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010) (citation omitted). To satisfy this standard, there must be "a showing that the arbitrators knew of the relevant [legal] principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." *Stolt-Nielsen S.A.*, 130 S. Ct. at 1768 (internal quotation marks omitted). In other words, awards should be enforced as long as there is a "barely colorable justification for the outcome reached." *T. Co. Metals*, 592 F.3d at 339.

Such a review is thus "highly deferential to the arbitrators," in large part because a more flexible standard of review would "frustrate the basic purpose of arbitration, which is to dispose of disputes quickly and avoid the expense and delay of extended court proceedings." *ST Microelectronics, N.V. v. Credit Suisse Securities (USA) LLC*, 648 F.3d 68, 78 (2d Cir. 2011)

---

[2] The future of the "manifest disregard" standard is unsettled. *See Stolt-Nielsen*, 130 S. Ct. at 1768 n.3 ("We do not decide whether 'manifest disregard' survives our decision in *Hall Street Associates* . . . as an independent ground for review . . . ."). However, in the Second Circuit, "manifest disregard" remains a "valid grounds for vacating arbitration awards," serving as "a judicial gloss" on the specific grounds for vacatur established by § 10(a) of the FAA. *T. Co. Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 340 (2d Cir. 2010) (citing *Stolt-Nielsen*, 130 S. Ct. at 1768 n.3).

(citation omitted).  Accordingly, an arbitral award should not be subject to vacatur "because of a simple error in law or a failure by the arbitrators to understand or apply it."  *Id.*  A court should only vacate an award "when a party clearly demonstrates that the panel *intentionally defied* the law." *Id.* (emphasis added).  Further, where there are separate and independent grounds for an arbitral award, the award cannot be vacated if at least one of the grounds can withstand legal challenge.  *See Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 390 (2d Cir. 2003) ("[W]here an arbitral award contains more than one plausible reading, manifest disregard cannot be found if at least one of the readings yields a legally correct justification for the outcome.").

The arbitral panel here based its decision on three independent grounds.  It held that (1) the plain language of the shareholders' agreement required that necessary funds be procured by pro rata borrowing from the shareholders; (2) the parties' interactions amounted to an implied joint venture, and thus imposing a duty by each joint venturer to contribute its share; and (3) Petitioners are entitled to contribution from Half Moon based on a theory of promissory estoppel. *See* Award at 7–9.  Because the arbitral panel based its decision on three independent grounds, to succeed in its motion to vacate, Half Moon must demonstrate that the arbitrators manifestly disregarded the law with respect to each.  *See Duferco*, 333 F.3d at 390.  For the reasons that follow, Half Moon has failed to establish that the arbitrators acted in manifest disregard of the law with respect to any of the three grounds.

### I.   Plain Language of Leader Shareholders' Agreement

The arbitral panel determined, first, that the plain language of the Leader Corporation shareholders' agreement required Half Moon to contribute necessary funds to the company.  Half Moon argues that this was error, and that the arbitrators misinterpreted the agreement to require Half Moon (1) to advance their share of the loan to Sapphire, and (2) to contribute their share of the losses arising out of the sale of the Sapphire Tanker.

It is well-settled that whether an arbitral panel misconstrued a contract is not a question open for judicial review.  *See T. Co. Metals*, 592 F.3d at 339 ("With respect to contract interpretation, this standard [manifest disregard of the law] essentially bars review of whether an arbitrator misconstrued a contract."); *DGS Foreign Trading (Shipping) Ltd. v. CHS, Inc.*, No. 10-cv-9131, 2011 WL 1044234, at *3 (S.D.N.Y. Mar. 9, 2011) (denying vacatur where movant challenged "the legal correctness of the Award" and argued "that the Award is contrary to unambiguous contractual language."); *Interdigital Commnc'ns Corp. v. Nokia Corp.*, 407 F. Supp. 2d 522, 531 (S.D.N.Y. 2005) ("Interpretation of a contract term is within the province of the arbitrator and will not be overruled simply because this Court might disagree with that interpretation.").  Erroneous interpretation of a contract does not equate to manifest disregard of the law.

In arguing to the contrary, Half Moon relies on cases holding that in New York, "interpretation of unambiguous contracts is a matter of law for the Court."  *See* Resp't's Br. 14 (citing cases).  These cases, however, do not arise out of motions to vacate an arbitral award. Half Moon does not identify any case in which a court has held that an erroneous interpretation of an agreement constituted manifest disregard of the law, justifying vacatur under the FAA.  *See ST Microelectronics*, 648 F.3d at 78.

In any event, even if such a claim were cognizable under the manifest disregard standard, the Court is not persuaded that the arbitrators misconstrued the agreement at issue here.  The Leader Corp. shareholders' agreement, between Ocean Shipping, Mason, and Half Moon, provides:  "All requirements of the Company exceeding the Company's own resources from time to time shall be procured by borrowing from the Shareholders on a pro rata basis."  Leader Agreement § 4(c).  Section 4(d)–(e) further provides that:

> In the event of the failure of a Shareholder to make a loan pursuant to this section 4(c) ("Loan Default") any non-defaulting Shareholder shall have the right to cure such Loan Default . . . . by advancing the shortfall, or its pro rata portion of the shortfall, of the defaulting Shareholder's loan to the Company.  Any additional advances by a non-defaulting Shareholder or Shareholders to cure such Loan Default shall be considered an open account demand loan to the defaulting Shareholder bearing interest at a monthly default rate of 2% assessed for each month . . . .

The shareholders' agreement thus expressly provides that funds needed for the operation of the Leader Corp. – and thus, through its ownership of Sapphire Corp., Sapphire Tanker – were to be borrowed from the shareholders on a pro rata basis.  This, in turn, comfortably supports the arbitrators' conclusion that Leader's shareholders (Mason, Ocean Shipping, and Half Moon) were obligated to lend funds to Sapphire Corp. in amounts proportionate to their ownership interest – 54%, 24%, and 24%, respectively – when additional funding was needed.  Because Leader Corp. owned 100% of Sapphire Corp. at the time that Petitioners made the $3 million loan to Sapphire, and because Half Moon owned 24% of Leader, it followed that Half Moon was required to contribute funds equal to 24% of the amount needed by – and lent to – Sapphire.  *See* Award at 3.  Similarly, when the Leader majority shareholders decided to sell Sapphire Tanker, and the company required additional funds to cover the portion of the bank loan that exceeded

the sales prices, the shareholders, including Half Moon, were each required under the contract to contribute, pro rata.

Half Moon makes two arguments in support of its claim that the shareholders' agreement did not, in fact, require it to make such contributions. First, it argues it committed to the financing requirements in the shareholders' agreement "on the assumption that the loan would be required some time in the summer of 2007," and there was "absolutely no reason" to think that "Petitioners would seek funds two years later." Resp't's Br. 15. Second, it argues that, properly read, the shareholders' agreement prohibited the company from seeking loans from outsiders, and did not require shareholders to lend money to the company pro rata upon the company's request. Resp't's Br. 16–17.

As to the first claim, contract interpretation turns on an objective examination of the reasonable meaning of the text of the agreement. It does not rely on a party's subjective expectations or assumptions, and where the text of an agreement is clear, there is no charter for examining extrinsic evidence. *See Hotchkiss v. Nat'l City Bank*, 200 F. 287, 293 (S.D.N.Y. 1911) (L. Hand, J.) ("A contract has . . . nothing to do with personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent."), *aff'd*, 201 F. 664 (2d Cir. 1912), *aff'd*, 231 U.S. 50 (1913); *see also Compagnie Noga d'Importation et d'Exportation S.A. v. Russian Fed.*, No. 00-cv-632, 2008 WL 3833257, at *5 (S.D.N.Y. Aug. 15, 2008) ("The court should analyze the plain language of the agreement and its internal structure first, before turning to other circumstances, such as time, place, and the parties' respective interests."); *S. Rd. Assoc., LLC v. Int'l Bus. Machs. Corp.*, 826 N.E.2d 806, 809 (N.Y. 2005) ("[E]xtrinsic and parol evidence is not admissible to create an ambiguity in a written agreement

which is complete and clear and unambiguous upon its face.") (citation omitted).  Half Moon's

claim that it entered into the agreement on the subjective assumption that loans would be limited

to those expected in 2007 has no basis in the text of the shareholders' agreement.

As to Half Moon's second claim, § 4(d) of the Leader Corp. shareholders' agreement is

to the contrary.  It clearly provides that a shareholder that fails to loan its pro rata portion is a

"defaulting Shareholder," and even sets the rate (2% per month) on which interest is to accrue on

that "[l]oan [d]efault."  Thus, the duty to loan money pro rata is obligatory, and not, contrary to

Half Moon's claim, a mere suggestion.

Accordingly, even if a claim of contract misinterpretation were cognizable under the

manifest disregard standard, the Court would, comfortably, conclude that the arbitrators'

decision was consistent with the shareholders' agreement.

## II. Joint Venture Status

Half Moon also challenges the second basis of the arbitrators' decision: that, in light of

the parties' "participations, agreements, and course of dealing with each other," there was an

implied joint venture under which Half Moon was liable for its share of the loans and funding at

issue.  Award at 8.

In disputing the existence of a joint venture, Half Moon argues that because the

"agreement between the parties here was expressed through a shareholders['] agreement within a

corporate entity . . . that corporate entity *cannot* also be a joint venture."  Resp't's Br. 10

(emphasis in original).  Half Moon is correct that an express joint venture did not exist between

the parties, inasmuch as there was no written joint venture agreement.  *See* Resp't's Br. 10.

However, contrary to Half Moon's claims, under New York law, even where there is no express

joint venture agreement, a joint venture may exist "based upon the *implied* agreement evidenced

15

by the parties' conduct." *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 583 (1st Dep't 2003). *Richbell* sets out the standard for a joint venture based on implied agreement:

> The indicia of the existence of a joint venture are: acts manifesting the intent of the parties to be associated as joint venturers, mutual contribution to the joint undertaking through a combination of property, financial resources, effort, skill or knowledge, a measure of joint proprietorship and control over the enterprise, and a provision for the sharing of profits and losses.

*Id.* at 584; *see also Mendelson v. Feinman*, 531 N.Y.S.2d 326, 328 (2d Dep't 1988) ("When determining whether a joint venture exists, the factors to be considered [include] the intent of the parties (express or implied), whether there was joint control and management of the company, whether there was a sharing of the profits as well as a sharing of the losses and whether there was a combination of property, skill or knowledge."); *Hasday v. Barocas*, 115 N.Y.S.2d 326 (N.Y. Sup. Ct. 1952) ("The ultimate inquiry is whether the parties have so joined their property, interests, skills and risks that for the purpose of the particular adventure their respective contributions have become as one and the . . . interests of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their joint benefit."). *Richbell* further establishes that individuals may act "as a corporation to the rest of the world" while acting as partners, or joint venturers, "between themselves." *Richbell Info. Servs.*, 765 N.Y.S.2d at 585.

Here, the arbitration panel reasonably concluded that the Star and Leader shareholders' agreements provided for a "mutual contribution" of "financial resources" to a "joint undertaking," and a "provision for the sharing of profits and losses." *Id.* at 584; *see* Star Agreement; Leader Agreement. The panel reasonably held that such actions "manifest[ed] the intent of the parties to be associated as joint venturers." *Richbell Info. Servs.*, 765 N.Y.S.2d at

584.  It was therefore not a manifest disregard of the law for the panel to find that an implied

joint venture existed between Sea Shipping, Ocean Shipping, Mason, and Half Moon with

respect to the formation of Star Corp., Leader Corp., and Sapphire Corp., and the subsequent

purchase and operation of the three tankers.

###### III. Promissory Estoppel

Half Moon, finally, challenges the panel's conclusion that Petitioners are entitled to

damages based on promissory estoppel.

"The elements of a cause of action based upon promissory estoppel are a clear and

unambiguous promise, reasonable and foreseeable reliance by the party to whom the promise is

made, and an injury sustained in reliance on that promise."  *Agress v. Clarkstown Cent. Sch.

Dist.*, 895 N.Y.S.2d 432, 434 (2d Dep't 2010) (internal citation omitted).  Here, Petitioners

alleged that Half Moon promised, via the Leader shareholders' agreement, to loan money to

Leader Corp. when it needed funds.  *See* Claimant's Br., Paulsen Aff. Ex. J at 37.  Because

Leader Corp. owned 100% of Sapphire Corp., Petitioners argued, it reasonably followed that the

promise by Leader shareholders (including Half Moon) to contribute needed funds applied

equally to Sapphire as well.  Petitioners argued that they had reasonably relied on that promise to

their detriment when they provided the $3 million loan to Sapphire, and were injured when Half

Moon did not fulfill that promise.  *See id.*  The arbitral panel found this argument "well

grounded."  Award at 9.

In response, Half Moon argues, factually, that "*no promise was ever made*" that could

support a finding of promissory estoppel.  Resp't's Br. 11.  Instead, it asserts, Petitioners

"considered asking Half Moon for a one million dollar loan," and that Half Moon then

"evaluated the loan request and determined it would be commercially reasonable."  *Id.* at 12.

17

However, Half Moon claims that this was the extent of the communications with respect to the loan, and that Half Moon never promised to make such a loan.  Because no promise was made, Half Moon argues, the elements of promissory estoppel are not satisfied.

Half Moon's argument – that it is entitled to vacatur because the arbitrators' erred in finding promissory estoppel – does not satisfy the standard of manifest disregard of the law.  Indeed, this claim does not assert manifest disregard of the law at all, but rather, properly construed, is a claim that the arbitrators disregarded *facts* or misapplied the *evidence*.  Disregard of facts or evidence is not a basis for vacatur.  *See Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 91 (2d Cir. 2008), *rev'd on other grounds*, 130 S. Ct. 1758 (2010) ("We do not, however, 'recognize manifest disregard of the *evidence* as proper ground for vacating an arbitrator's award.'") (quoting *Wallace*, 378 F.3d at 193).  To determine whether the arbitrators erred in their finding that the elements of promissory estoppel were satisfied, the Court would have to review the arbitral panel's findings of fact and decide whether the panel's application of the evidence in the record merited vacatur.  But the FAA supplies no basis under which a court may vacate an award based upon such review.  Section 10 of the FAA provides that a district court may vacate an arbitral award "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy."  9 U.S.C. § 10(a)(3).  Half Moon does not allege, however, that the panel refused to *hear* evidence pertinent to the question of whether a promise was made; only that it *misapplied* the evidence at hand.  The Court therefore rejects Half Moon's claim of manifest disregard as applied to the panel's third alternative ground for its decision.

## CONCLUSION

The arbitral panel identified three independent grounds for its award. The motion to vacate the award must be denied if any of those grounds can withstand legal challenge. Here, for the reasons set forth herein, the Court rejects Half Moon's claims, as to each of those three grounds, that the arbitral panel manifestly disregarded the law.

Petitioners' motion to confirm the arbitration award against Half Moon is therefore GRANTED. Half Moon's petition to vacate the award is DENIED. The Clerk of Court is directed to enter judgment for the Petitioners in the sum of $4,504,888, plus arbitrators' fees, plus interest accruing at the rates detailed in the arbitral award. The Clerk of Court is further directed to close this case.

SO ORDERED.

Paul A. Engelmayer

Paul A. Engelmayer
United States District Judge

Dated: January 26, 2012
       New York, New York

19